## Sparks v. Commonwealth.

(Decided February 3, 1925.)

### Appeal from Daviess Circuit Court.

1. Homicide—Evidence Held to Sustain Conviction for Manslaughter. —Evidence held to sustain conviction for manslaughter.

2. Homicide—Evidence of Deceased's Good Character, though Erroneously Admitted, Held Not Prejudicial.—In homicide case receipt of evidence of deceased's good character, though error, held

not prejudicial, where given in answer to contrary showing by defendant.

LOUIS I. IGLEHART and R. M. HOLLAND for appellant.

FRANK E. DAUGHERTY, Attorney General, and MOORMAN DITTO, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

Appellant Sparks asks this court to reverse the judgment of conviction entered against him in the Daviess circuit court for the crime of manslaughter, fixing his punishment at twenty (20) years' confinement in the state penitentiary on the ground, (1) that the verdict is flagrantly against the evidence and is the result of passion and prejudice; (2) the court erred in permitting the Commonwealth to introduce evidence as to the good character of the deceased.

Appellant Sparks was a farm tenant, residing on the lands of the deceased, Owen Robinson. He had raised a crop of tobacco on the place in 1923 and had prepared and marketed all, or a part of it, before the killing on February 1, 1924. Robinson, the landowner, was a member of the tobacco pool but appellant was a nonmember, and did not want to market his product through that organization, while Robinson insisted on the crop which was raised on his land being turned over to the pool. This caused some controversy between the two men and there is some evidence to show that appellant had ill-feelings toward Robinson on account of Robinson's attitude towards the pool and his insistence upon appellant marketing his part of the crop through that organization. There is also evidence for the Commonwealth that on the morning of the killing Sparks approached his landlord and asked him about a division of the tobacco stalks, claiming that as the crop was raised upon the halves, he was entitled to one-half of the stalks, which claim was denied by Robinson, and this excited the ire of appellant.

There were no eye-witnesses to the killing, but there were several witnesses who saw the parties shortly before the firing of the fatal shot and immediately thereafter. The deceased, Robinson, was a bachelor, living alone. Some time before the killing his nephew and wife had lived with deceased, but they had moved away. It is claimed by appellant that the deceased was infatuated with his nephew's wife and that he was carrying on

illicit relations with her. On the morning of the homicide, which happened about nine o'clock, appellant went to the tobacco barn not far from the house of Robinson, and talked to some men who were at work stripping tobacco. While there one of the colored men told him of a controversy he had the night before with Robinson, and pointed to a pistol in his coat pocket which he had to defend himself against Robinson. Before leaving the barn appellant took the pistol without the knowledge of the colored man and concealed it upon his person. When he left the barn he walked along a path leading towards the house of the deceased. Entering the yard he went to the pump to get a drink of water, so he says; while there deceased appeared upon the rear steps of his residence, and a conversation between the men started. Appellant says that deceased, Robinson, had been looking for the wife of his nephew and could not locate her and was jealous and suspicious of appellant, thinking he had been with her the night before, or at least knew her whereabouts, she having been absent from home. He also says they had a dispute about the tobacco stalks. He relates this controversy in the following way:

"I says, 'Mr. Robinson, what are you going to do with my part of those tobacco stalks? Are you willing to allow me anything for them?' and he said, 'Allow you something for them?' and I said, 'Yes, sir,' and he said, 'I have been farming for 20 or 30 years,' I am not sure which, and he says, 'I have have never allowed anybody to take any tobacco stalks away from here,' and he says, 'I don't aim to start it now.' 'Well,' I says, 'I raised the crop on the halves with you, didn't I?' and he said, 'Yes,' and I said, 'Aren't half of these stalks mine?' and he said, 'I never have divided with anybody, and I don't intend to.' I said, 'Of course I can't make you, but I think I am entitled to them anyway,' and I said, 'If you feel that way about it I had rather give them to you than to have any argument about them.'"

After relating the conversation between himself and deceased, appellant testified that the deceased asked him:

" 'Where had you been when you came into Tom Shauntee's store last night?' I said I had been

down to McIntyre's store, and he looked kind of curious to me, and he says, 'You know where that woman was?' and I told him I didn't; all I knew is what I had told him, and he said, 'You are a lying son-of-a-bitch; you were with her and I am going to beat your brains out with these knucks,' and he made a dive at me and I jumped out to the side and aimed to run out the gate, but there was a wire on it. It had a weight on it and he keeps a wire over a slat on a post, and he whirled and backed into me right at me and I jumped to the side and he hung onto my overcoat tail with his left hand and when he did that I jerked this pistol out that I had and we began going round and round and I fired and when I fired the first shot he done this (ducking his head) and I fired again about that time and he whirled and fell kinder this way."

Further along he testified, when speaking of deceased:

"He struck twice and got me the second time that he struck. He would lunge at me like a lion. He was an awful big, stout man and he was making it pretty warm for me and had me scared, too."

At the time of the shooting appellant wore an overcoat. He was asked:

"Q. Show the jury just how he got hold of your coat. Let Mr. Holland there hold you. A. He caught hold of my coat just there (demonstrating how this was done); I was standing up here at the gate when he made the dive at me the first time, and I jumped to the left and he had his knucks on his right hand and I aimed to run out this gate and I run up against the gate and the wire was there over the slat and I jumped to the side and he reached with his left hand and grabbed my coat and I shot and he ducked his head and I shot again and he fell just like this. That is all that happened and that was the end of it."

No witness for the Commonwealth saw the shooting, but the surrounding circumstances, including the wound in the back of deceased's head; the fact that there were no powder burns and that the hole made by the bullet was oblong, indicating that the bullet had turned side-

ways, and, therefore, had traveled some distance before striking the head of Robinson, were all against appellant. One witness testified he saw appellant on one side of the gate and Robinson on the other immediately before the shooting. Another, that upon hearing the shots he looked in the direction of the place where the homicide happened and saw appellant walking toward the prostrate form of Robinson; that appellant stooped down near the body. There is evidence in the record proving that a bullet from a pistol, such as was used by appellant in killing Robinson, does not turn immediately upon leaving the barrel of a pistol, but after it has traveled some distance it may do so. It is a well known fact that unless the muzzle of a pistol or gun is close to the object at which it is fired, there will be no powder burn, but that if it is close there will be powder burn. According to appellant's evidence deceased had hold of his coat and had struck him once with the knucks and was in the act of striking him again, which of necessity would have brought the two men very close together. Another fact which contradicts appellant's contention that he shot Robinson while the latter was holding to his coat and running after him is the wound in the back of Robinson's head. It is hard to understand how Robinson could have been struck in the back of the head by a bullet from a gun fired in front of him. These incontrovertible facts were sufficient to warrant the jury in concluding that the story told by appellant on the trial was a fabrication. Added to this was the evidence by two or three witnesses to the effect that appellant told different stories about how the shooting happened immediately after the homicide. These facts considered the verdict cannot be said to be flagrantly or at all against the weight of the evidence.

In presenting his evidence appellant proved by several witnesses in a rather general way that deceased, Robinson, was a man of bad moral character and was guilty of immoral conduct; that on different occasions he had been known to carry brass knucks, which is a deadly weapon when used in the way intended to be employed; that he had threatened the life of one or two persons.

It was the contention of the Commonwealth that Robinson was a man of good character, not at all given to rowdyism or to provoking difficulties. When appellant introduced the evidence tending in a way to impeach

the character of the deceased the Commonwealth called two or three witnesses in rebuttal to prove and did prove that the deceased was a man of good moral character and bore a good reputation for peace and quietude. The evidence offered by appellant was an invitation, so to speak, to the Commonwealth to establish the good character of the deceased and it did so in the way we have stated. While this practice must not be encouraged or approved, we think, under the facts in this case, the appellant was not prejudiced by the introduction of the evidence by the Commonwealth showing the good character of the deceased, after appellant had by evidence, after a manner, attacked his character.

The evidence introduced by appellant showing that deceased went armed and carried knucks and that he had threatened different people on different occasions, and that he was a man of bad moral character, furnished some grounds for the allowance of the evidence by the Commonwealth to establish the contrary. Appellant is, therefore, in no position to complain that the Commonwealth introduced evidence to rebut that offered by himself on the character of the deceased. He was not prejudiced by the allowance of the evidence showing deceased's good character, though it was error to admit it.

Finding no error to the prejudice of the substantial rights of appellant the judgment is affirmed.